**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LILIA WILTSHIRE | : | |
| 3632 Regency Lane, | : | |
| York, PA 17402 | : | Civil Action No.: _____ |
| | : | |
| Plaintiff, | : | |
| | : | **JURY TRIAL DEMANDED** |
| v. | : | |
| | : | |
| UHS OF PENNSYLVANIA, INC. | : | |
| D/B/A ROXBURY TREATMENT | : | |
| CENTER | : | |
| 367 South Gulph Road, | : | |
| King of Prussia, PA 19406 | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT – CIVIL ACTION

Plaintiff, Lilia Wiltshire ("Plaintiff"), by and through her undersigned

counsel, for her Complaint against UHS of Pennsylvania, Inc. d/b/a Roxbury

Treatment Center ("Defendant"), alleges as follows:

## INTRODUCTION

1.      Plaintiff brings this action to redress violations by Defendant of Title

VII of the Civil Rights Act of 1964 ("Title VII"), 29 U.S.C. § 2000e, *et seq.*, and the

Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.*

2.      Specifically, Plaintiff contends that Defendant refused to take

appropriate remedial action to address a hostile work environment caused by sexual

1

harassment and retaliated against Plaintiff because of her good faith complaints of sexual harassment, which resulted in Plaintiff's constructive discharge.

3.    As a result, Plaintiff has suffered damages as set forth herein.

## PARTIES

4.    Plaintiff, Lilia Wiltshire, is a citizen of the United States and Pennsylvania, where she currently maintains an address at 3632 Regency Lane, York, PA 17402.

5.    Defendant, UHS of Pennsylvania, Inc. d/b/a Roxbury Treatment Center is a for-profit corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 367 South Gulph Road, King of Prussia, PA 19406.

## JURISDICTION AND VENUE

6.    Paragraphs 1 through 5 are hereby incorporated by reference as though the same were fully set forth at length herein.

7.    On or about January 21, 2025, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dually filed with the Pennsylvania Human Relations Commission ("PHRC"), thereby satisfying the requirements of 42 U.S.C. § 2000e-5(b) and (c), and 43 P.S. § 959(a).  Plaintiff's EEOC Charge was docketed as EEOC Charge No.

530-2025-03180.  Plaintiff's EEOC Charge was dual filed within one hundred and eighty (180) days of the unlawful employment practice.

8.    By correspondence dated November 24, 2025, Plaintiff received a Notice of Right to Sue from the EEOC regarding her Charge, advising Plaintiff that she had ninety (90) days to file suit against Defendant.

9.    Plaintiff filed the instant action within the statutory time frame applicable to her federal claims.

10.    Plaintiff has therefore exhausted her administrative remedies and has complied with all conditions precedent to maintain this action.

11.    This is an action authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 29 U.S.C. § 2000e, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.*

12.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as it is a civil rights action arising under the laws of the United States.

13.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims arise out of the same common nucleus of operative fact as her federal claims.

14.    The venue in this district is proper pursuant to 28 U.S.C. § 1391(b), as the unlawful practices of which Plaintiff is complaining were committed in the Commonwealth of Pennsylvania in this judicial district.

## FACTUAL BACKGROUND

15.     Paragraphs 1 through 14 are hereby incorporated by reference a though the same were fully set forth at length herein.

16.     On or about August 7, 2023, Plaintiff began her employment with Defendant as a Mental Health Technician ("MHT"), located at 601 Roxbury Road, Shippensburg, PA 17257 location.

17.     By way of background, Defendant has services for drug treatment and detox, outpatient services, and a 24/7 inpatient psychiatric program, with different units for adults and adolescents.

18.     Plaintiffs position as an MHT required her to work in the inpatient psychiatric program, working with patients with severe mental illness, psychosis, and suicidal ideation.

19.     Plaintiff's duties included helping patients with hygiene, meals, housekeeping, applying restraints when needed, and regularly making rounds to check on patients.

20.     Plaintiff's schedule was as needed, and she was able to pick up shifts as they worked for her.

21.     Plaintiff's preference was for the adolescent inpatient unit over the adult inpatient unit, but Plaintiff did work at the latter when needed.

22. In approximately late August or September 2023, within several weeks of starting, Defendant 's Maintenance Employee, Bill Last Name Unknown ("LNU") ("Bill LNU"), began to touch her lower back and suggestively stare at Plaintiff.

23. Patients also began to tell Plaintiff that they had noticed Bill LNU staring at her butt.

24. Plaintiff told Defendant's Shift Supervisor, April LNU , and Defendant's Human Resource ("HR") Director, Terri Pendleton ("Ms. Pendleton") about Bill LNU and how uncomfortable he made Plaintiff.

25. Ms. Pendleton responded to Plaintiff with something to the effect of "Bill is an older man and probably views you as a daughter.

26. Ms. Pendleton also asked Plaintiff if she had told Bill LNU to stop.

27. Plaintiff responded that she had asked Bill LNU to stop.

28. Ms. Pendleton told Plaintiff to let her know if Bill LNU did it again.

29. Bill LNU did touch Plaintiff again.

30. Plaintiff had heard stories of other staff's complaints to Ms. Pendleton about another of Defendant's employees, a Charge Nurse named Divine Kum ("Mr. Kum"), going unaddressed.

31. For this reason, Plaintiff did not report Bill LNU for fear that it would be futile.

32. To Plaintiff's knowledge, Bill LNU still works for Defendant.

33. In or around September 2023, Plaintiff first met Mr. Kum at work during a shift change, though Plaintiff had previously heard stories about him from other MHT's her age that Mr. Kum regularly made sexual advances and was very forward toward them and other staff members.

34. By way of background, Plaintiff estimate Mr. Kum to be approximately six foot, two inches, and weighing 220 pounds.

35. Plaintiff is approximately five (5) feet, five (5) inches tall and weighs about 160 lbs.

36. Plaintiff believes that Mr. Kum has been working for Defendant for some time prior to her start date, and that he primarily worked on the adult inpatient unit.

37. Another one of Defendant's Charge Nurse, Seasons LNU, had previously reported Mr. Kum's sexually harassing behavior to Ms. Pendleton.

38. From Plaintiff's understanding and belief, Ms. Pendleton told Seasons LNU that Mr. Kum's behavior was due to "cultural differences."

39. Immediately upon meeting Mr. Kum, he began making comments about Plaintiff's appearance, including remarks on her "curves."

40. Mr. Kum also asked Plaintiff out on a date and asked for her cell phone number.

41. Plaintiff declined both and told Mr. Kum that Plaintiff was uncomfortable with his advances.

42. Sometime after these comments, in or around Fall 2023, Mr. Kum followed Plaintiff around on a shift in the adult inpatient unit.

43. Mr. Kum remarked to Plaintiff that "your butt bounces when you walk," and made sexually suggestive hand gestures at her.

44. Mr. Kum proceeded to follow Plaintiff down a hallway, walking behind her.

45. Plaintiff mentioned this behavior to another Charge Nurse, Erin McCradle ("Ms. McCradle"), who laughed and said that this is "common behavior" for Mr. Kum.

46. Shortly after the incident, Plaintiff reported the behavior and his comments to April LNU and Defendant's Director of Performance Improvement, Lehoma Theimer ("Ms. Theimer").

47. They promised Plaintiff that they would bring Mr. Kum's behavior to Ms. Pendleton's attention.

48. On or about November 11, 2023, Mr. Kum texted Plaintiff that he was "really into" her, and to "give [him] a shot" at a date.

49. Plaintiff texted him back that she was not interested.

50. On or about November 22, 2023, Mr. Kum again texted Plaintiff that she was "beautiful."

51. Plaintiff did not give Mr. Kum her phone number, and in fact had declined to give it to him previously.

52. Plaintiff does not know how he got her phone number.

53. On or about December 4, 2023, Mr. Kum texted Plaintiff again.

54. Plaintiff did not respond.

55. On or about December 7, 2023, Mr. Kum texted Plaintiff and asked her out on a date once again.

56. Plaintiff did not respond to this text either.

57. In or about December 2023, Plaintiff showed Mr. Kum's texts and again reported his behavior to April LNU, Ms. Theimer, and some of Defendant's other Charge Nurses.

58. April LNU recommended that Plaintiff not bring up Mr. Kum's advances to Ms. Pendleton because "you know what happened to Seasons" when she did the same thing.

59. Around this time, Plaintiff also informed Ms. Theimer that Plaintiff would prefer to be on the adolescent unit in order to avoid Mr. Kum.

60. Mr. Kum's comments and advances toward Plaintiff continued through December 2023 and January 2024.

61.     In or about December 2023, Plaintiff was present on the adult inpatient unit (despite her insistence that she work on the adolescent unit) when Mr. Kum got overly physical with a patient and performed an unnecessary medical restraint.

62.     Plaintiff tried to intervene, but Mr. Kum told her to mind her own business.

63.      Amanda Wagner ("Ms. Wagner"), Defendant 's Patient Safety Officer, did an investigation into this incident.

64.     Plaintiff was questioned about Mr. Kum's behavior.

65.     In or around late winter in 2024, an additional incident occurred shortly thereafter with a patient on the adolescent unit when Mr. Kum again used unreasonable force with a disabled minor, resulting in Mr. Kum's inability to work on that unit for approximately a month.

66.     In or around January 2024, during the course of Plaintiff's performance review, Plaintiff reported Mr. Kum's behavior to Defendant's then-Director of Nursing, Mary LNU.

67.     Mary LNU promised to speak with Ms. Pendleton immediately and also promised Plaintiff that she would be kept on the adolescent unit.

68.     In or around February 2024, Plaintiff spoke with Jolena Lofland ("Ms Lofland"), Defendant 's HR Generalist, about Mr. Kum and his unwanted advances.

69. Around that same time, Plaintiff again asked April LNU to stop moving her shifts from the adolescent unit to the adult unit because Plaintiff was continuing to have her shifts adjusted to the adult unit over her protests.

70. Since Plaintiff was able to choose what shifts to pick up, Plaintiff was purposely picking up shifts in the adolescent inpatient unit only to avoid Mr. Kum, who was primarily in the adult inpatient unit.

71. Plaintiff told April LNU that she did not want to work the adult inpatient unit due to Mr. Kum's behavior.

72. However, Defendant was at times, without telling Plaintiff, moving her from the adolescent unit into the adult unit and again assigning Mr. Kum shifts in the adolescent unit, forcing Plaintiff to continue working with Mr. Kum despite her repeated complaints about his sexually harassing behavior.

73. In or around February 2024, an incident occurred with a patient on the adolescent unit when Mr. Kum again used unreasonable force with a disabled minor, resulting in Mr. Kum's inability to work on that unit for approximately a month.

74. On or around April 2024, Plaintiff responded to an adolescent in distress.

75. A restraint was ordered and "code 100" was called.

76.     While on the floor physically dealing with an adolescent patient who was having a mental health episode, Mr. Kum responded from another unit, assisting in the restraint.

77.     While Mr. Kum assisted Plaintiff, he stared at her butt, making eye contact with Plaintiff then returning his gaze to her bottom.

78.     After the restraint Mr. Kum asked Plaintiff to go out on a date again.

79.     Plaintiff declined his advances.

80.     On or about May 27, 2024, Plaintiff again was forced to work with Mr. Kum, who asked Plaintiff why she wouldn't respond to his text messages and why he had not seen Plaintiff at work.

81.     Mr. Kum and Plaintiff were the only ones on the adolescent inpatient floor overnight.

82.     When Plaintiff asked Mr. Kum, who was sitting around and watching television, to do his job so Plaintiff could do hers, he stood up, got in Plaintiff's face.

83.     Mr. Kum then proceeded to follow Plaintiff down the hallway while screaming at her.

84.     Plaintiff texted Ms. Wagner for help and said that she was uncomfortable with Mr. Kum's behavior.

85.     After this incident, Plaintiff stopped picking up shifts, because Plaintiff did not want to continue to work with Mr. Kum.

11

86.    On or about June 5, 2024, Plaintiff reported Mr. Kum's sexual advances and comments to Ms. Wagner and reminded her that April LNU, Mary LNU, and Ms. Theimer were aware of his behavior.

87.    On or about June 7, 2024, Plaintiff spoke with Ms. Wagner and Ms. Pendleton about some behavioral issues with some patients, as well as Mr. Kum's continued conduct.

88.    Ms. Wagner and Ms. Pendleton asked Plaintiff if she had told him to stop.

89.    Ms. Wagner and Ms. Pendleton further asked Plaintiff to provide an email summary of Mr. Kum's behavior.

90.    Later that same day, Plaintiff sent a detailed email about Mr. Kum's nine months of harassment to Ms. Wagner and asked her to pass it along to Ms. Pendleton, whose email address Plaintiff did not have.

91.    In this email, in addition to recounting situation with Mr. Kum, Plaintiff relayed that "I haven't picked up shifts because my safety is at risk," and that Defendant was informed many times of his behavior and did nothing.

92.    Plaintiff ended the email asking for expectations moving forward, and said "I am asking for [Defendant 's] intervention at this time."

93.    In the weeks that followed, April LNU continually asked Plaintiff to pick up shifts.

94. Defendant did not provide Plaintiff with any more information about Mr. Kum or any investigation into his behavior.

95. To Plaintiff's knowledge, Mr. Kum is still employed with Defendant.

96. Because of Mr. Kum's continued employment with Defendant, Plaintiff continued to decline to pick up shifts.

97. On or about September 5, 2024, Plaintiff submitted her formal resignation to Defendant, citing Mr. Kum's non-stop sexual harassment and Defendant 's "lack of action" regarding the same.

98. Plaintiff spoke with Ms. Pendleton, who indicated that she thought Plaintiff had been terminated.

99. On or about September 13, 2024, Plaintiff received a letter in the mail from Defendant, stating that Plaintiff had "resigned" on July 26, 2024, due to failure to pick up shifts.

100. As a result of the hostile work environment, gender discrimination, and retaliation due to Mr. Kum's sexual harassment to which Plaintiff was subjected to, Plaintiff has suffered damages in the form of, *inter alia*, mental and emotional distress, which altered the conditions of her employment and resulted in an abusive working environment.

101. Based on the foregoing, Plaintiff avers that Defendant failed to take appropriate remedial action to address Mr. Kum's sexual harassment directed at

Plaintiff, retaliated against Plaintiff because of her good faith reports of sexual harassment, and constructively discharged Plaintiff, in violation of Title VII and the PHRA.

102.    As a result of Defendant's deliberate, unlawful, and malicious acts as set forth above, Plaintiff has suffered loss of employment, earnings, raises, other significant economic benefits, and emotional pain and suffering.

**COUNT I**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**29 U.S.C. § 2000e, et seq.**
**HOSTILE WORK ENVIRONMENT – SEXUAL HARASSMENT**

103.    Paragraphs 1 through 102 are hereby incorporated by reference as though the same were fully set forth at length herein.

104.    Defendant had fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the then-current or preceding calendar years applicable to Plaintiff's claims.

105.    Defendant is therefore an "employer" as defined and covered by Title VII.

106.    At all times material hereto, Plaintiff was an "employee" of Defendant as defined by Title VII.

107.    Defendant subjected Plaintiff to and/or otherwise permitted the existence of a hostile work environment because of sexual harassment in violation of Title VII.

14

108.   Defendant failed to take appropriate remedial action to address the hostile work environment created by sexual harassment that Plaintiff endured and reported to Defendant in good faith, and caused Plaintiff to be constructively discharged.

109.   As a result of Defendant's deliberate, unlawful, and malicious acts as set forth above, Plaintiff has suffered loss of employment, earnings, raises, other significant economic benefits, and emotional pain and suffering.

**COUNT II**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**29 U.S.C. § 2000e, et seq.**
**GENDER AND SEX DISCRIMINATION**

110.   Paragraphs 1 through 109 are hereby incorporated by reference as though the same were fully set forth at length herein.

111.   Defendant had fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the then-current or preceding calendar years applicable to Plaintiff's claims.

112.   Defendant is therefore an "employer" as defined and covered by Title VII.

113.   At all times material hereto, Plaintiff was an "employee" of Defendant as defined by Title VII.

114.   Plaintiff is a member of a protected class due to her gender and sex.

115.   Plaintiff suffered an adverse employment action .

15

116. Said adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination on the basis of gender and sex.

117. Defendant subjected Plaintiff to and/or otherwise permitted the existence of discrimination because of gender and sex in violation of Title VII.

118. Defendant failed to take appropriate remedial action to address the discrimination that Plaintiff endured and reported to Defendant in good faith.

119. As a result of Defendant's deliberate, unlawful, and malicious acts as set forth above, Plaintiff has suffered loss of employment, earnings, raises, other significant economic benefits, and emotional pain and suffering.

## COUNT III
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 29 U.S.C. § 2000e, *et seq.*
### RETALIATION

120. Paragraphs 1 through 119 are hereby incorporated by reference as though the same were fully set forth at length herein.

121. Defendant had fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the then-current or preceding calendar years applicable to Plaintiff's claims.

122. Defendant is therefore an "employer" as defined and covered by Title VII.

16

123. At all times material hereto, Plaintiff was an "employee" of Defendant as defined by Title VII.

124. Plaintiff made good faith complaints of sexual harassment to Defendant.

125. Defendant failed to take appropriate remedial action to address the sexual harassment that Plaintiff endured.

126. Defendant refused Plaintiff's requests to change her shifts or to transfer Plaintiff to a different unit.

127. Defendant's failure to take appropriate remedial action in response to Plaintiff's good faith complaints of sexual harassment and/or a hostile work environment resulted in Plaintiff's constructive discharge.

128. The aforementioned acts, or refusals to act, of Defendant constitute retaliation directed at Plaintiff because of her good faith complaints about the hostile work environment caused by Mr. Kum's sexual harassment, in violation of Title VII.

129. As a result of Defendant's deliberate, unlawful, and malicious acts as set forth above, Plaintiff has suffered loss of employment, earnings, raises, other significant economic benefits, and emotional pain and suffering.

**COUNT IV**
**PENNSYLVANIA HUMAN RELATIONS ACT**
**43 P.S. § 951,** *et seq.*
**HOSTILE WORK ENVIRONMENT – SEXUAL HARASSMENT**

130.   Paragraphs 1 through 129 are hereby incorporated by reference as though the same were fully set forth at length herein.

131.   Defendant had four (4) or more employees at all times applicable to Plaintiff's claims.

132.   Defendant is therefore an "employer" as defined and covered by the PHRA.

133.   At all times material hereto, Plaintiff was an "employee" of Defendant as defined by the PHRA.

134.   Defendant subjected Plaintiff to and/or otherwise permitted the existence of a hostile work environment because of sexual harassment in violation of the PHRA.

135.   Defendant failed to take appropriate remedial action to address the hostile work environment created by sexual harassment that Plaintiff endured and reported to Defendant in good faith, and caused Plaintiff to be constructively discharged.

136.   As a result of Defendant's deliberate, unlawful, and malicious acts as set forth above, Plaintiff has suffered loss of employment, earnings, raises, other significant economic benefits, and emotional pain and suffering.

**COUNT V**
**PENNSYLVANIA HUMAN RELATIONS ACT**
**43 P.S. § 951,** *et seq.*
**GENDER AND SEX DISCRIMINATION**

18

137. Paragraphs 1 through 136 are hereby incorporated by reference as though the same were fully set forth at length herein.

138. Defendant had four (4) or more employees at all times applicable to Plaintiff's claims.

139. Defendant is therefore an "employer" as defined and covered by the PHRA.

140. At all times material hereto, Plaintiff was an "employee" of Defendant as defined by the PHRA.

141. Plaintiff is a member of a protected class due to her gender and sex.

142. Plaintiff suffered an adverse employment action.

143. Said adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination on the basis of gender and sex.

144. Defendant subjected Plaintiff to and/or otherwise permitted the existence of discrimination because of gender and sex in violation of the PHRA.

145. Defendant failed to take appropriate remedial action to address the discrimination that Plaintiff endured and reported to Defendant in good faith.

146. As a result of Defendant's deliberate, unlawful, and malicious acts as set forth above, Plaintiff has suffered loss of employment, earnings, raises, other significant economic benefits, and emotional pain and suffering.

## COUNT VI
## PENNSYLVANIA HUMAN RELATIONS ACT
### 43 P.S. § 951, *et seq.*
### RETALIATION

147. Paragraphs 1 through 146 are hereby incorporated by reference as though the same were fully set forth at length herein.

148. Defendant had four (4) or more employees at all times applicable to Plaintiff's claims.

149. Defendant is therefore an "employer" as defined and covered by the PHRA.

150. At all times material hereto, Plaintiff was an "employee" of Defendant as defined by the PHRA.

151. Plaintiff made good faith complaints of sexual harassment to Defendant.

152. Defendant failed to take appropriate remedial action to address the sexual harassment that Plaintiff endured.

153. Defendant refused Plaintiff's requests to change her shifts or to transfer Plaintiff to a different unit.

154. Defendant's failure to take appropriate remedial action in response to Plaintiff's good faith complaints of sexual harassment and/or a hostile work environment resulted in Plaintiff's constructive discharge.

155.    The aforementioned acts, or refusals to act, of Defendant constitute retaliation directed at Plaintiff because of her good faith complaints about the hostile work environment caused by Mr. Kum's sexual harassment, in violation of the PHRA.

156.    As a result of Defendant's deliberate, unlawful, and malicious acts as set forth above, Plaintiff has suffered loss of employment, earnings, raises, other significant economic benefits, and emotional pain and suffering.

**WHEREFORE**, as a result of the unlawful conduct of Defendant, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, and grant her the maximum relief allowed by law, including, but not limited to:

A.    Back wages, front pay, lost benefits, and compensatory damages in an amount to be determined at trial;

B.    Plaintiff's costs, disbursements, and attorneys' fees incurred in prosecuting this action;

C.    Pre-judgment interest in an appropriate amount;

D.    Such other and further relief as is just and equitable under the circumstances; and,

21

E.    Any verdict in favor of Plaintiff be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages as set forth by applicable law.

## JURY DEMAND

157.   Plaintiff hereby demands a trial by jury as to all issues so triable.

Respectfully submitted,

**MARZZACCO INJURY LAW**

By:    /s/ *Faith Fogle Pensinger*
Faith Fogle Pensinger, Esq.
945 East Park Drive, Suite 103
Harrisburg, PA 17111
TEL: 717-231-1640
FAX: 717-231-1650
fpensinger@klnivenlaw.com
*Attorney for Plaintiff*

Dated: February 17, 2026

## DEMAND TO PRESERVE EVIDENCE

The Defendant is hereby demanded to preserve all physical and electronic information pertaining in any way to Plaintiff's employment, to Plaintiff's potential claims and her claims to damages, to any defenses to same, including but not limited to, electronic data storage, employment files, files, memos, job descriptions, text messages, emails, spreadsheets, images, cache memory, payroll records, paystubs, time records, timesheets, and any other information and/or data which may be relevant to any claim or defense in this litigation.

24